# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| JASON LEOPOLD, *et al.* | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 17-2176 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 14, 16 |
| | : | | |
| CENTRAL INTELLIGENCE AGENCY, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
### DENYING PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

In this case under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, plaintiffs Buzzfeed and Buzzfeed reporter Jason Leopold (together, "Buzzfeed") seek to obtain records of the Central Intelligence Agency ("CIA") relating to an alleged covert CIA program to arm Syrian rebels. Buzzfeed also seeks CIA records referencing a tweet by President Donald J. Trump that allegedly revealed the existence of the program. The CIA has now moved for summary judgment, arguing that it has properly refused to disclose the existence or absence of records relating to the alleged covert program (a so-called "*Glomar* response"), and that it has conducted an adequate search for, and performed adequate redactions when releasing, agency records relating to the presidential tweet. Buzzfeed cross-moves for summary judgment solely on the issue of whether the *Glomar* response was appropriate, arguing that the President's tweet has already made the existence of the program public. Because the Court finds that the President has not revealed the existence of a *CIA-led* program to arm Syrian rebels, it grants the CIA's motion for summary judgment and denies Buzzfeed's cross motion.

## II. BACKGROUND

### A. The Washington Post Article and Subsequent Trump Administration Comments

The facts underlying this case can be summarized in a few paragraphs. On July 19, 2017, the Washington Post published an article describing the Trump administration's termination, a month earlier, of an alleged covert CIA program to arm rebels to the government of Bachar Al-Assad in Syria. Greg Jaffe & Adam Entous, *Trump Ends Covert CIA Program to Arm Anti-Assad Rebels in Syria, a Move Sought by Moscow*, Washington Post, July 19, 2017, Pls.' Cross Mot. Summ. J. Ex. 1, at 2, ECF No. 16-2;[1] Pls.' Statement of Material Facts ("SMF") ¶ 1, ECF No. 16-3; Def.'s Resp. Pls.' SMF ¶ 1, ECF No. 18-1.

Two days later on July 21, 2017, General Raymond Thomas, the commander of the United States Special Operations Command—the U.S. command overseeing special operations forces of the U.S. Army, Marine Corps, Navy, and Air Force, *see* 10 U.S.C. § 167—was asked about the program's termination at the 2017 Aspen Security Forum. *See* Excerpts from General Raymond Thomas's Statements at the 2017 Aspen Security Forum, July 21, 2017, Pls.' Cross Mot. Ex. 2, at 7; Pls.' SMF ¶ 8; Def.'s Resp. Pls.' SMF ¶ 8. Catherine Herridge, Fox News's chief intelligence correspondent, asked whether "it [was General Thomas's] assessment that this was done to create favor with Russia, or that it was not an effective program." Excerpts from Gen. Thomas's Statements 7. General Thomas responded:

> Absolutely—absolutely not in my—at least from what I know about that program and the decision to end it. Absolutely not a SOP to the Russians. It was I think based on assessment of the nature of the program, what we're trying to accomplish, the viability of it going forward, and a tough, tough decision. I mean we're all reading the editorials now of are we leaving people at the altar, you know, people have we manned and equipped, but they're—it is so much more

---

[1] Because the exhibits in support of Buzzfeed's cross motion are included in a single attachment to the motion, the Court uses PACER page numbers when referring to each exhibit throughout this opinion.

complex than even I can describe, and again that's not necessarily an organization that I've been affiliated with, but a sister—a parallel activity that was—that had a tough, you know, some would argue impossible mission based on the approach we took. It might have been scoped too narrowly or not empowered sufficiently. I don't know enough about it to criticize it in that direction, but it had a tough road to hope.

*Id.*

On July 24, 2017, the President tweeted from his Twitter account @realDonaldTrump that "[t]he Amazon Washington Post fabricated the facts on my ending massive, dangerous, and wasteful payments to Syrian rebels fighting Assad." @realDonaldTrump, Twitter (July 25, 2017, 07:23 PM), https://twitter.com/realdonaldtrump/status/889672374458646528.

Finally, on July 25, 2017, President Trump was interviewed by the Wall Street Journal ("WSJ"). Pls.' SMF ¶ 10; Def.'s Resp. Pl's SMF ¶ 10. In the course of discussing intelligence leaks in his administration, President Trump referenced an unnamed Washington Post story about a weapons program in Syria:

> Trump: I'm talking about intelligence leaks. I'm talking like the story about Syria that was in The New York Times the other day. I'm—which by the way, was a decision made by people, not me. But, you know, they wrote it 100—it was in the –
>
> WSJ: The Post, I thought. It was in the Washington Post.
>
> Trump: It was in The Washington Post. That was not something that I was involved in, other than they did come and they suggested. It turns out it's—a lot of al-Qaida we're giving these weapons to. You know, they didn't write the truthful story, which they never do. So all of those things are very important. But, no, I'm very disappointed in the fact that the Justice Department has not gone after the leakers. And they're the ones that have the great power to go after the leakers, you understand. So—and I'm very disappointed in Jeff Sessions.
>
> Excerpts from President Donald Trump's Interview with the Wall Street Journal, July 25, 2017, Pls.' Cross Mot. Ex. 3, at 9.

## B.  Procedural History

On September 12, 2017, Buzzfeed submitted a six-part FOIA request to the CIA.  Compl.
¶ 10, ECF No. 1.  Five of the six subparts in the request were directed at records related to an
alleged program of CIA payments to Syrian rebels fighting the Assad government.  *Id.*  Part one
sought the "studies, memos, assessments, and intelligence products, mentioning or referring to
CIA payments to Syrian rebels fighting Assad."  *Id.*  Part two sought "[a]ny and all emails
mentioning or referring to" such payments.  *Id.*  Part three sought "[a]ny and all correspondence
to or from a member of Congress or a Congressional Committee mentioning or referring to" such
payments.  *Id.*  Part five sought "any and all records mentioning or referring to the ending of the
CIA's payments."  *Id.*  And finally, part six sought "records authorizing the CIA to make
payments to Syrian rebels," including any "'FINDING' authorized by President Barack Obama."
*Id.*  Part four of the request, on the other hand, sought records related to the July 24, 2017 tweet,
with Buzzfeed requesting "[a]ny and all records that mentions or refers to the July 24, 2017
[tweet] by President Donald Trump."  *Id.*

Although the CIA acknowledged receipt of Buzzfeed's request on September 14, 2017,
*id.* ¶ 12, it failed to respond to the request, *id.* ¶ 13.  On October 19, 2017, Buzzfeed filed suit.
*See generally id.*  On December 18, 2017, the parties filed a stipulation regarding the scope of
the FOIA request, with Buzzfeed agreeing to restrict its request to exclude any documents
obtained or created by the CIA in connection with the litigation of a FOIA case involving a
substantially similar FOIA request, *New York Times Co. v. CIA*, 17-cv-6354 (ALC) (S.D.N.Y.).
Stipulation 1, ECF No. 10.  And on February 1, 2018, the parties represented that the CIA had
issued a *Glomar* response with respect to the entire request pursuant to FOIA Exemptions 1 and
3, but that it would be conducting a search for records responsive to part 4 of the request that

4

referenced the presidential tweet but did not implicate the alleged covert CIA program. Joint Status Report 1–2 (Feb. 1, 2018), ECF No. 12. The parties further represented that they had agreed to restrict the search to e-mail records in five CIA offices: the Office of the Director, Office of the Deputy Director, Office of the Chief Operating Officer, Office of General Counsel, and Office of Public Affairs. *Id.* at 2. The limited search uncovered two responsive e-mails, which the CIA redacted and produced to Buzzfeed on April 17, 2018. Def.'s SMF ¶¶ 11–13, ECF No. 14-1; Pls.' Resp. Def.'s SMF ¶ 11–13, ECF No. 15-3.

The CIA moved for summary judgment on May 4, 2018, arguing both that its *Glomar* response to the request was valid and that the limited search for responsive, non-exempt records it conducted in response to part 4 of the request was adequate. Def.'s Mem. Supp. Summ. J. 1–2, ECF No. 14. On June 4, 2018, Buzzfeed filed both an opposition to the motion and its own cross motion for summary judgment. Pls.' Mem. Opp'n, ECF No. 15; Pls.' Mem. Supp. Cross Mot. Summ. J., ECF No. 16. On July 11, 2018, the CIA filed its opposition to the cross motion and reply. Def.'s Mem. Opp'n, ECF No. 18; Def's Reply, ECF No. 19. And Buzzfeed filed its reply on August 6, 2018. Pls.' Reply, ECF No. 20. The cross motions are now ripe for review.

### III. LEGAL STANDARD

The Freedom of Information Act "sets forth a policy of broad disclosure of Government documents in order 'to ensure an informed citizenry, vital to the functioning of a democratic society.'" *FBI v. Abramson*, 456 U.S. 615, 621 (1982) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)). "[D]isclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). FOIA accordingly "mandates release of properly requested federal agency records, unless the materials fall squarely within one of nine statutory exemptions." *Hunton & Williams LLP v. EPA*, 346 F. Supp. 3d 61, 72 (D.D.C.

2018) (citing *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011)). And "even if some materials from the requested record are exempt from disclosure, any reasonably segregable information from those documents must be disclosed after redaction of the exempt information," unless the non-exempt portions are "inextricably intertwined with exempt portions." *Id.* (internal quotation marks omitted) (quoting *Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002)).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)). An agency is entitled to summary judgment if no material facts are genuinely in dispute and the agency demonstrates "that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017). "This burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately has the onus of proving that the documents are exempt from disclosure,' while the 'burden upon the requester is merely to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (brackets omitted) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)).

To carry its burden, the agency must provide "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of the withheld document to which they apply." *Elec. Privacy Info. Ctr. v. DEA*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016) (quoting *Mead Data Cent., Inc. v. U.S.*

*Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)).  And to justify a *Glomar* response,

"[t]he agency must demonstrate that acknowledging the mere existence of responsive records

would disclose exempt information." *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C.

Cir. 2012) (citing *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)).  The agency "cannot justify

its withholdings on the basis of summary statements that merely reiterate legal standards or offer

'far-ranging category definitions for information,'" *Citizens for Responsibility & Ethics in Wash.*

*v. U.S. Dep't of Justice*, 955 F. Supp. 2d 4, 13 (D.D.C. 2013) (quoting *King v. U.S. Dep't of*

*Justice*, 830 F.2d 210, 221 (D.C. Cir. 1987)), but it "may rely on declarations that are reasonably

detailed and non-conclusory," *Pinson v. U.S. Dep't of Justice*, 245 F. Supp. 3d 225, 239 (D.D.C.

2018).  While reviewing courts should "respect the expertise of an agency," *Hayden v. NSA /*

*Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979), courts review an agency's decision to

withhold records *de novo* and will only endorse that decision if the agency's justification for

invoking a FOIA exemption "appears 'logical' or 'plausible,'" *Pinson*, 245 F. Supp. 3d at 239

(quoting *Wolf*, 473 F.3d at 374–75).

"Even if a nonmovant does not respond to a motion for summary judgment, the court

cannot grant the motion as conceded." *Hunton & Williams*, 346 F. Supp. 3d at 73 (citing

*Winston & Strawn, LLP v. McLean*, 843 F.3d 502, 505 (D.C. Cir. 2016)).  This is because

"[u]nder the Federal Rules of Civil Procedure, a motion for summary judgment cannot be

'conceded' for want of opposition.  'The burden is always on the movant to demonstrate why

summary judgment is warranted.  The nonmoving party's failure to oppose summary judgment

does not shift that burden.'" *Winston & Strawn*, 843 F.3d at 505 (quoting *Grimes v. District of*

*Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015) (Griffith, J., concurring)).  A court reviewing an

unopposed motion for summary judgment must accordingly "always determine for itself whether

the record and any undisputed material facts justify granting summary judgment." *Id.* (quoting *Grimes*, 794 F.3d at 97 (Griffith, J., concurring)).

## IV. ANALYSIS

The CIA moves for summary judgment as to both the validity of its *Glomar* response pursuant to FOIA Exemptions 1 and 3 and the adequacy of its limited search for records in response to part 4 of Buzzfeed's request. In its opposition and cross motion, Buzzfeed argues that the CIA's *Glomar* response is improper because President Trump officially acknowledged the existence of a covert CIA program of payments to Syrian rebels in his July 24, 2017 tweet. Buzzfeed does not otherwise challenge the CIA's invocation of FOIA Exemptions 1 and 3, the adequacy of the agency's search, or the redaction of information on the two released e-mails. The Court first reviews whether the July 24, 2017 tweet officially acknowledged the existence of the alleged CIA program, and concludes that it did not. The Court next reviews the CIA's invocation of FOIA Exemption 1 and 3, and finally the agency's limited search for records. Because it finds that the agency properly invoked both exemptions and conducted an adequate search for records, the Court grants the CIA's motion for summary judgment and denies Buzzfeed's cross motion.

### A. The July 24, 2017 Tweet Did Not Officially Acknowledge the Alleged CIA Program

The only contested issue in this case is the legal significance the Court should impart to President Trump's July 24, 2017 tweet. According to Buzzfeed, the tweet constituted an official acknowledgment of a CIA program of payments to anti-Assad Syrian rebels mentioned in the Washington Post's July 19, 2017 article, and the CIA can no longer refuse to acknowledge the existence or absence of records concerning the program. The CIA contends that the tweet is too vague and ambiguous to constitute the official acknowledgment of a covert payment program, let

alone a program ran by the CIA.[2]  The Court first reviews the relevant legal standard for official

disclosure, before going over the parties' arguments.  Without pronouncing itself as to whether

the tweet acknowledged the existence of any government program, the Court agrees that it did

not officially reveal the existence of a *CIA* program, and thus that there has been no official

acknowledgment of the information the CIA seeks to protect through its *Glomar* response.

1.  What Constitutes "Official Disclosure" in the *Glomar* Context

Under the "official acknowledgment" line of FOIA cases, "when an agency has officially

acknowledged otherwise exempt information through prior disclosure, the agency has waived its

right to claim an exemption with respect to that information."  *Am. Civil Liberties Union v. CIA*

("*ACLU*"), 710 F.3d 422, 426 (D.C. Cir. 2013).  "A plaintiff mounting an official

acknowledgment argument 'must bear the initial burden of pointing to specific information in the

public domain that appears to duplicate that being withheld.'"  *Id.* at 427 (quoting *Wolf*, 473 F.3d

at 378).  And because the specific information at issue in a *Glomar* case "is not the contents of a

particular record, but rather 'the existence *vel non*' of any records responsive to the FOIA

request," a plaintiff can "overcome a *Glomar* response by showing that the agency has already

disclosed the fact of the existence (or nonexistence) of responsive records."  *Id.* at 427 (quoting

*Wolf*, 473 F.3d at 379).  When the plaintiff has pointed to the required specific information,

courts must evaluate "whether it is 'logical or plausible' for the [agency] to contend that it would

---

[2] The CIA does not argue that the July 19, 2017 tweet was not an official statement, and instead "assum[es] arguendo" that it was.  Def.'s Mem. Supp. 11.  The Court notes that the government took the position that presidential tweets were official statements in *James Madison Project v. Department of Justice*, 302 F. Supp. 3d 12, 24 (D.D.C. 2018) ("So, Defendants say, 'a [tweet] by any other name would smell as sweet' as any other official statement, at least for purposes of the official acknowledgment doctrine." (alteration in original) (quoting William Shakespeare, *Romeo and Juliet*, act 2, sc. 2)).  Because Buzzfeed's official acknowledgment argument fails independently of whether the tweet was an official statement, the Court assumes that it was and does not address the issue in its discussion below.

reveal something not already officially acknowledged" by disclosing the existence or absence of documents. *Id.* at 429 (internal citation omitted) (quoting *Wolf*, 473 F.3d at 375).

On first glance, the CIA and Buzzfeed appear to offer conflicting standards for what constitutes "specific information" meeting the plaintiff's burden. The CIA argues that "[t]he D.C. Circuit has narrowly construed the official acknowledgment principle . . . and the plaintiff must satisfy three stringent criteria." Def.'s Mem. Supp. 10 (citing *Associated Press v. FBI*, 265 F. Supp. 3d 82, 96 (D.D.C. 2017)). Under the three-part test established in *Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990), "[f]irst, the information requested must be as specific as the information previously released." *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765). Next, "the information requested must match the information previously disclosed." *Id.* (quoting *Fitzgibbon*, 911 F.2d at 765). And finally, "the information requested must already have been made public through an official and documented disclosure." *Id.* (quoting *Fitzgibbon*, 911 F.2d at 765). By contrast, Buzzfeed focuses on the broad language in *ACLU* and contends that the Court "must use its common sense" in reviewing information supporting a claim of official disclosure. Pls.' Mem. Supp. 1. According to Buzzfeed, the D.C. Circuit in *ACLU* admonished district courts to look at official statements "from the perspective of a 'reasonable person' and to determine whether the fiction of deniability is 'plausible,'" with the result that "a statement need not be completely free of any ambiguity whatsoever" to trigger the official acknowledgment doctrine. Pls.' Mem. Supp. 1 (quoting *ACLU*, 710 F.3d at 431).

As the parties recognize however, the reasoning of the *Fitzgibbon* line of cases and of *ACLU* is not necessarily at odds. *ACLU*'s admonition that an agency's *Glomar* response must be "logical or plausible," 710 F.3d at 429 (quoting *Wolf*, 473 F.3d at 375), and focus on reviewing the fiction of deniability from the perspective of a reasonable person did not displace

*Fitzgibbon*'s three-part test, which the circuit has used in official acknowledgment cases since *ACLU, e.g. Mobley v. CIA*, 806 F.3d 568, 583–84 (D.C. Cir. 2015). Rather, having determined that the information sought had already been officially acknowledged, the circuit in *ACLU* found, applying the "logical or plausible" standard under which all agency invocations of FOIA exemptions are reviewed, that the CIA had not met its burden to issue a *Glomar* response. 710 F.3d at 429–30.

As a court in this circuit recently held in a FOIA case involving a similar issue, what the *ACLU* court did provide guidance on was the "type of proof . . . required to establish that the existence of a document has been officially acknowledged." *James Madison Project v. Dep't of Justice*, 302 F. Supp. 3d 12, 22 (D.D.C. 2018). In addition to cases such as *Wolf* "where the existence of responsive records is plain on the face of the official statement," *ACLU* made clear that records are also officially acknowledged when "the substance of an official statement and the context in which it is made permits the inescapable inference that the requested records in fact exist." *Id.* In essence, while leaving intact the requirement that the information sought be as specific as, and match, the information disclosed, *ACLU* recognized that courts can infer such a disclosure when the statement does not explicitly disclose the information but leaves no doubt as to its existence. Courts must nonetheless keep in mind that the D.C. Circuit has consistently applied the *Fitzgibbon* test "strictly." *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011).

## 2. Application to This Case

Here, Buzzfeed argues that the information sought to be protected by the CIA's *Glomar* response—the existence or absence of a covert CIA program of payments to Syrian rebels—has already been officially acknowledged. Buzzfeed does not argue that President Trump's July 24, 2017 tweet makes clear, on its face, the existence of the covert CIA program (and of records

associated to such a program). Rather, Buzzfeed argues that the tweet, both alone and in conjunction with General Thomas's statements at the Aspen Security Conference and the President's interview with the Wall Street Journal on July 25, 2017, leads to the inescapable inference that such a program existed and was run by CIA before the President ended it. *See* Pls.' Mem. Supp. 2–7. The Court disagrees.

First, the Court finds that the tweet alone is not sufficiently precise to constitute an official acknowledgment of a CIA program of payments to Syrian rebels. In the tweet, the President stated: "[t]he Amazon Washington Post fabricated the facts on my ending massive, dangerous, and wasteful payments to Syrian rebels fighting Assad." @realDonaldTrump, Twitter (July 24, 2017, 07:23 PM). Buzzfeed contends that "[a]ny reasonable person would understand the . . . tweet as disclosing that the CIA had made payments to Syrian rebels." Pls.' Mem. Supp. 2. While the tweet states that the Washington Post "fabricated the facts," Buzzfeed points out that "it would not make any sense to describe non-existent payments as being 'massive, dangerous, and wasteful.'" *Id.* at 3. Buzzfeed also notes that it would be illogical for the President to accuse the Post of "fabricat[ing] the facts on *my* ending massive . . . payments" if there were no payments to end in the first place. Pls.' Mem. Supp. 3.

However, Buzzfeed does not explain how the tweet reveals the existence of a *CIA* program of payments to Syrian rebels—nor can it. The CIA argues that the tweet "does not link to or otherwise identify any particular article in the Washington Post," that it "does not specify in what respect the Washington Post's reporting is inaccurate," leaving it is unclear what program, if any, exists, and in any event that the tweet provides no indication of "the CIA's involvement in any such program." Def.'s Mem. Supp. 11. Without taking a position as to what program, if

any, the tweet may have officially acknowledged,[3] the Court agrees on the last point. Even assuming, *arguendo*, that a program of covert payments to Syrian rebels existed, the President's tweet did not mention the CIA or create any inference that such a program would be linked to or run by the CIA. The President might have acknowledged the existence of "massive, dangerous, and wasteful" payments to Syrian rebels, but he did not mention from which branch of government such payments would have originated.

Even taking into account the context behind the tweet and assuming it referred to the Washington Post article, the President's characterization of the facts in the article as "fabricated" negates any inference that can be drawn from it as to the source of the payments. Because the article asserted that the program was a CIA program, Buzzfeed assumes that the President acknowledged as much, and that his reference to fabricated facts in the article necessarily concerned the details of the program rather than its origin. *See* Pls.' Mem. Supp. 6. The Court cannot make such an assumption. At most, the tweet revealed that multiple payments were made by the government[4] to Syrian rebels, that the President ended those payments, and that the Washington Post incorrectly reported on the payments. Nor is the CIA required to point to "[an]other agency which would have authority to make payments to rebel groups in foreign

---

[3] The Court is not entirely convinced by the CIA's arguments on the issue. The agency does not meaningfully attempt to refute the commonsense conclusion that the President's tweet was in response to the July 19, 2017 article. Similarly, the CIA contends that because the tweet does not specify which facts were fabricated, it could be interpreted to mean that the article fabricated "the existence of a covert program" altogether. Def.'s Mem. Supp. 11. But as Buzzfeed points out, it is difficult to "explain how a tweet about 'my ending . . . payments' would make any sense if there were no U.S. government payments to end." Pls.' Reply 5.

[4] Given the coalition of governments that is operating in the region, one could also plausibly assume that the President may have influence over payments made by other governments.

countries."[5]  Pls.' Reply 7.  Buzzfeed has the "initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld," *Wolf*, 473 F.3d at 378 (quoting *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983), and it has not met that burden.

Buzzfeed's reliance on *ACLU* for the proposition that the Court must assume the CIA is behind any covert payment program is also misplaced.  In *ACLU*, the plaintiff sought the production of "records pertaining to the use of unmanned aerial vehicles ('UAVs') . . . by the CIA *and the Armed Forces* for the purposes of killing targeted individuals."  *ACLU*, 710 F.3d at 425 (emphasis added).  In issuing its *Glomar* response, the agency indicated that disclosing the existence of documents would "reveal . . . whether or not the CIA is involved in drone strikes or at least has an intelligence interest in drone strikes."  *Id.* at 428.   But an official statement by President Obama had already revealed the use of drone strikes.  *Id.* at 429.  As a result, the D.C. Circuit found the *Glomar* response "neither logical nor plausible" because it would "strain[] credulity to suggest that an agency charged with gathering intelligence affecting the national security does not have an 'intelligence interest' in drone strikes, even if that agency does not operate the drones itself."  *Id.* at 430.   By contrast here, Buzzfeed strictly asked for documents relating to "CIA payments."  Compl. ¶ 10.  Buzzfeed's request does not implicate any intelligence interest the CIA may have in any program run by other government components, so the Court cannot infer that documents responsive to Buzzfeed's request exist.

Perhaps recognizing the issue, Buzzfeed also argues in its motion that additional statements made contemporaneously with the tweet support the notion that the CIA, and no other

---

[5] In any event, as Buzzfeed recognizes, "[an]other agency that could plausibly be making [such] payments . . . is the Department of Defense."  Pls.' Mem. Supp. 6.

agency, was in charge of the alleged covert program. Buzzfeed notes that "the only other agency that could plausibly be making payments to Syrian rebels fighting Assad is the Department of Defense." Pls.' Mem. Supp. 6. And it points to General Thomas's statements at the Aspen Security Forum as a public denial that the program was run by the Department of Defense by "an authorized Department of Defense official." *Id.* at 6–7. Even setting aside the D.C. Circuit's admonition that courts should "not deem 'official' a disclosure made by someone other than the agency from which the information is being sought," *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999), the Court cannot read that much into General Thomas's statements. First, Buzzfeed provides no support for its assertion that "the only other agency that could plausibly be making payments . . . is the Department of Defense." *Id.* at 6. Buzzfeed simply concludes as much, and assumes that the Court will do so as well.[6] And second, the Court agrees with the *New York Times* court that General Thomas's statements "lack sufficient specificity to have any bearing on the CIA's *Glomar* response." *New York Times v. CIA*, 314 F. Supp. 3d 519, 531 (S.D.N.Y. 2018), *appeal docketed*, No. 18-2112 (2d Cir.). General Thomas did not name the CIA or otherwise "clarify which agencies were involved with the alleged covert program." *Id.* While referencing the decision to terminate the program, he stated: "again that's not necessarily an organization that I've been affiliated with, but a sister—a parallel activity that was—that had a tough, you know, some would argue impossible mission." Excerpts from Gen. Thomas's Statements 7. Given the ambiguity in that statement, it is unclear to the Court whether General

---

[6] The Court notes that multiple articles published on the issue have suggested that the State Department was also involved in providing support to Syrian rebels. *E.g.*, Melanie Eversley, *Report: U.S.-funded Weapons Reaching Syrian Rebels*, USA Today (Sept. 12, 2013), https://www.usatoday.com/story/news/world/2013/09/11/cia-state-department-weapons-gear-syrian-rebels/2802491/; Mark Landler & Michael R. Gordon, *U.S. Offers Training and Other Aid to Syrian Rebels*, New York Times (Feb. 27, 2013), https://www.nytimes.com/2013/02/28/world/middleeast/us-expands-aid-to-syrian-rebels.html.

Thomas referred to a sister organization to the Department of Defense, or to a sister department to JSOC within the Department of Defense that ran the "parallel activity."[7]  *Id.*  Ultimately, General Thomas's statements are too ambiguous for the Court to infer that the CIA, rather than another federal agency, ran the alleged covert payment program.  The Court therefore finds that the information sought to be withheld by the CIA's *Glomar* response has not already been publicly acknowledged.

## B.  The CIA's *Glomar* Response Pursuant to FOIA Exemptions 1 and 3 Was Appropriate

The Court next reviews whether the CIA's *Glomar* response pursuant to FOIA Exemptions 1 and 3 was appropriate.  While Buzzfeed does not challenge the validity of the claimed exemptions, Pls.' Mem. Supp. 1 n.1., "the court cannot grant the motion as conceded" and must determine for itself whether the exemptions apply.  *Hunton & Williams*, 346 F. Supp. 3d at 73 (citing *Winston & Strawn*, 843 F.3d at 505).  The Court reviews each claimed exemption in turn, and finds that the CIA's *Glomar* response was appropriate under both.

### 1.  Exemption 1

First, the CIA argues that its *Glomar* response was proper under Exemption 1 because revealing whether or not the agency operates a covert program of payments to Syrian rebels would disclose classified material, the disclosure of which could reasonably be expected to cause damage to the national security.  Def.'s Mem. Supp. 13–15.  The Court agrees.

---

[7] According to the Department of Defense's website, General Thomas previously served as the Associate Director for Military Affairs at the CIA.  *See* General Raymond A. Thomas III, Department of Defense, https://dod.defense.gov/About/Biographies/ Biography-View/Article/709270/general-raymond-a-thomas-iii/; *see also* Thomas Gibbons-Neff, *JSOC Commander Tapped to Lead Special Operations Command*, Washington Post (Feb. 29, 2016), https://www.washingtonpost.com/news/checkpoint/wp/2016/02/29/former-jsoc-commander-tapped-to-lead-special-operations-command/?utm_term=.235ba0496d67 (noting General Thomas's appointment at the CIA in 2013).  Arguably, the CIA could be considered an organization General Thomas has been affiliated with in the past.

Under FOIA Exemption 1, an agency can withhold from disclosure documents that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). And to justify its *Glomar* response, "[t]he agency must demonstrate that acknowledging the mere existence of responsive records would disclose exempt information." *Elec. Privacy Info. Ctr.*, 678 F.3d at 931 (citing *Wolf*, 473 F.3d at 374). The D.C. Circuit has "consistently deferred to executive affidavits predicting harm to national security, and ha[s] found it unwise to undertake searching judicial review." *Am. Civil Liberties Union v. U.S. Dep't of Defense*, 628 F.3d 612, 624 (D.C. Cir. 2011) (quoting *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003)).

Here, the CIA argues that the information sought to be withheld is properly classified by Executive Order 13526, which allows the classification of national security information concerning "intelligence activities (including covert action)," Executive Order 13526 § 1.4(c), 75 Fed. Reg. 707, 709 (Dec. 29, 2009), if "unauthorized disclosure of the information reasonably could be expected to result in damage to the national security," *id.* § 1.1(a)(4), 75 Fed. Reg. at 707. In a declaration in support of the agency's motion, Antoinette B. Shiner, an information review officer at the CIA, represents that the alleged covert program of payments to Syrian rebels is a classified fact relating to a "covert action." Declaration of Antoinette B. Shiner ¶¶ 19–20, 22, ECF No. 14-2; *see* Def.'s Mem. Supp. 13–14. Shiner indicates that disclosure of that fact could reasonably be expected to harm national security by "reveal[ing] whether or not the United States Government exercised extraordinary legal authorities to covertly influence the political, economic, and/or military conditions in Syria," as well as "reveal[ing] the [CIA's] capabilities, intelligence and regional interests, accesses, funding, and relationships, or lack

thereof." Shiner Decl. ¶ 22. This disclosure would, *inter alia*, allow adversaries to "gain a more accurate picture of the CIA's activities, which would impair the effectiveness of [the] CIA's intelligence operations." *Id.*

Without taking a position as to whether disclosure would reveal the existence of a *U.S. covert action program*,[8] the Court readily finds that it would reveal information about the CIA that "would impair the effectiveness of [the] CIA's intelligence operations." *Id.* "Because '[t]he assessment of harm to intelligence sources, methods and operations is entrusted to the Director of Central Intelligence, not to the courts,'" the government's burden here "is a light one." *Am. Civil Liberties Union*, 628 F.3d at 624 (alteration in original) (quoting *Fitzgibbon*, 911 F.2d at 766). And the Shiner declaration logically and plausibly suggests that disclosure here would harm the effectiveness of the CIA's intelligence efforts—and by extension the national security of the United States. The Court need go no further. Accordingly, the Court finds that the agency's *Glomar* response was properly supported by FOIA Exemption 1.

### 2. Exemption 3

The CIA contends that its *Glomar* response was also proper under FOIA Exemption 3 because the information sought to be withheld is barred from disclosure pursuant to the National Security Act of 1947, 50 U.S.C. §§ 3001–3234. The Court finds this argument meritorious as well.

Under Exemption 3, an agency can withhold from disclosure matters that are "specifically exempted from disclosure by statute," provided that the statute either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue"

---

[8] As discussed above in Part IV.A., the Court does not address what covert program, if any, President Trump's July 24, 2017 tweet may have revealed.

or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A). Accordingly, "[u]nder that exemption, the CIA need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute." *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (citing *Fitzgibbon*, 911 F.2d at 761–62).

Here, the CIA argues that the National Security Act is an exemption statute that bars disclosure of the information sought to be withheld because it protects from disclosure "intelligence sources and methods." Def.'s Mem. Supp. 16 (quoting 50 U.S.C. § 3024(i)(1)); Shiner Decl. ¶ 24. The Court agrees. First, multiple courts in this circuit have recognized that the National Security Act is an exemption statute for the purposes of Exemption 3. *E.g.*, *Am. Civil Liberties Union*, 628 F.3d at 619; *Larson*, 565 F.3d at 865. And second, the D.C. Circuit has treated § 3024(i)(1) of the National Security Act broadly, "holding that material is properly withheld under the Act if it '*relates* to intelligence sources and methods,'" *Leopold v. CIA*, 106 F. Supp. 3d 51, 57 (D.D.C. 2015) (quoting *Larson*, 565 F.3d at 865), or if it "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods," *id.* (citing *Halperin v. CIA*, 629 F.2d 144, 147 (D.C. Cir. 1980)). In essence, "the Act's protection of sources and methods is a 'near-blanket FOIA exemption.'" *Id.* (quoting *Whalen v. U.S. Marine Corps*, 407 F. Supp. 2d 54, 59 n.5 (D.D.C. 2005)). The CIA represents that "[t]he fact of whether or not the CIA is, or has, exercised covert action authorities constitutes a protected 'intelligence source or method.'" Shiner Decl. ¶ 24. The Court finds that rationale plausible, and thus holds that the agency's *Glomar* response was also adequately supported by FOIA Exemption 3.

## C. The CIA's Limited Search Was Adequate

Finally, the Court reviews whether the limited search the CIA conducted for items responsive to part 4 of Buzzfeed's request was adequate and whether the redactions to documents released to Buzzfeed as a result of that search are logical and plausible. As with the CIA's invocation of Exemptions 1 and 3 above, Buzzfeed does not challenge the adequacy of the CIA's search and release of redacted documents but the Court nonetheless "determine[s] for itself whether the record and any undisputed material facts justify granting summary judgment." *Winston & Strawn*, 843 F.3d at 505 (quoting *Grimes*, 794 F.3d at 97 (Griffith, J., concurring)). The Court concludes that they do.

### 1. The CIA Conducted an Adequate Search for Documents Responsive to Part 4 of the Request

First, the Court finds that the CIA's limited search for documents responsive to part 4 of Buzzfeed's request but not involving the information sought to be protected by the agency's *Glomar* response was adequate. "An 'agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Defs. of Wildlife*, 623 F. Supp. 2d at 91 (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999)). An agency seeking summary judgment "on the basis that it conducted an adequate search . . . must provide a 'reasonably detailed' affidavit describing the scope of that search." *Pinson*, 245 F. Supp. 3d at 241 (quoting *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 313–14 (D.C. Cir. 2003)). And courts generally "give considerable deference to agency affidavits supporting their searches." *Id.* Here, the CIA represents that, pursuant to its agreement with Buzzfeed, it ran its search for records "from 24 July 2017, the date of the tweet, forward and searched the e-mail accounts of every employee serving in the five offices [the parties identified] during this period." Shiner Decl. ¶ 10. The

CIA used the search terms "Trump," "Twitter," "Tweet," "Syria," and "President" in different combinations, and also ran a search for the full text of the July 24, 2017 tweet. *Id.* ¶ 11. The agency then conducted a "page-by-page, line-by-line review" of the two records found before disclosing them. *Id.* ¶ 12. The Court finds that the Shiner declaration provides the required reasonably detailed description of the search conducted, and demonstrates that the search was reasonably calculated to uncover the documents sought.

    2. The CIA Appropriately Redacted Information Pursuant to Exemptions 3 and 6

    Next, the Court reviews the agency's invocation of FOIA Exemptions 3 and 6 to withhold the "Agency username and the email addresses and telephone numbers of an Agency employee and two journalists." Shiner Decl. ¶ 13. The Court finds that the redactions are appropriate and grants summary judgment to the agency.

    The CIA justifies its withholding of an agency username and of the e-mail address and telephone number for an agency employee under Exemption 3, arguing that the CIA Act of 1949, 50 U.S.C. § 3507, allows the agency to protect from disclosure "information that would reveal the CIA's organization, functions, and the names of CIA employees." Shiner Decl. ¶ 13. As discussed above in Part IV.B., to prevail in its invocation of Exemption 3 the agency "need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute." *Larson*, 565 F.3d at 865 (citing *Fitzgibbon*, 911 F.2d at 761–62). Courts in this circuit have recognized that the CIA Act is an exempting statute, *see, e.g. Inst. for Policy Studies v. CIA*, 885 F. Supp. 2d 120, 150 (D.D.C. 2012), and the Court finds plausible the agency's assertion that revealing the agency information sought to be withheld would constitute a "disclosure of the organization, functions, [or] names . . . of personnel employed by the Agency," 50 U.S.C. § 3507.

As to the reporters' e-mail addresses and phone numbers, the CIA argues that the redactions were made pursuant to FOIA Exemption 6, which shields from disclosure "files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 6 requires courts to "balance the individual's right of privacy against the basic policy of opening agency action to the light of public scrutiny." *Billington v. U.S. Dep't of Justice*, 301 F. Supp. 2d 15, 19 (D.D.C. 2009) (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 175 (1991)). Here, the CIA asserts that "revealing this information could subject these individuals to harassment or unwanted contact from third parties," and that there is "no countervailing, cognizable public interest in its release." Shiner Decl. ¶ 14. Buzzfeed does not identify any countervailing public interest that would outweigh the reporters' privacy interests, and the Court finds the justification for the Exemption 6 redactions plausible.

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 14) is **GRANTED**. Plaintiffs' cross motion for summary judgment (ECF No. 16) is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 29, 2019                                    RUDOLPH CONTRERAS
                                                          United States District Judge